Thank you, your honors. My name is Tom McBury and I'm here representing CMWA. The question before the court this morning is really not that complicated. The question is, has Central Montana Wildlands Association raised serious questions concerning the potential impacts on the wilderness characteristics of the Big Snowys Wilderness Study Area from the Forest Services' thus far unsuccessful attempts to manage motorized recreation in that area of the forest? We have raised serious questions about the size and the scope of the impacts from motorized vehicles on the wilderness characteristics than an EIS is required. So wilderness characteristics are defined by the Forest Service. Mr. Smith, you actually have to prove, your focus has to be on the travel plan, not on what's going on in general or what has been going on on the ground, is that right? The focus is on the decision to approve the new travel management for the Big Snowys. Wilderness characteristics are defined by the Forest Service to, as indicated by the number, to include the opportunity for solitude, which is indicated by the number of individuals or parties a hiker might expect to encounter in the Big Snowys Wilderness Area, as well as the opportunity for primitive recreation experience normally found in non-motorized recreational areas. So under the arbitrary and capricious standard, the Forest Service completely ignored the following important factors. Number one, the impacts to the wilderness character of an area, as it existed in 1977, from increases in the intensity of motorized uses since 1977. Could I ask you about that? This is where I kind of got stopped and maybe you can explain this to me. In 1977, there's no limits on snowmobiles, correct? No, that's actually not true. There was a travel management plan in place in 1977. And what were the limits on snowmobiles in 1977? Oh, on snowmobiles, I'm sorry. I think you were actually correct because it was relatively inaccessible to snowmobiles. Here's what I was trying to figure out, because if there were no limits on snowmobiles at the time, that of course, it gives you that as a baseline, but it doesn't necessarily tell you that that actually would fulfill wilderness characteristics. So I'm wondering, how does the baseline of 1977, when there's no snowmobile limits, intersect with what we understand more traditionally to be wilderness, where you wouldn't necessarily have snowmobiles zooming around? Well, that gets to the sort of heart of the disagreement on how to analyze the decision and how to manage vehicles. We believe that the Forest Service basically takes the position of just looking at maps and saying, you know, this area was open to snowmobiles back in 1977, regardless of the And there were this many trails and there were this many roads that could be accessed with motorized vehicles in the summertime. And now, under our new management plan, and that's our baseline, and under our new management plan, we're reducing the amount of miles of roads and trails that can be accessed in the summertime, and we're confining the areas that can be accessed by snowmobiles in the wintertime. Let me just make sure I understand. You're saying that due to the nature of the terrain and the accessibility of other roads, that really, there wouldn't be any snowmobiles because they couldn't get there anyway, back in 1977? In 1977, the Forest Service says snowmobiles could access the creeks, basically go along the roads along the creeks without going up on the more rugged terrain. And now snowmobiles can go anywhere. And that's why this is an issue. But they claim to have figured out what percentage of the territory that was, and now to have figured out that it's a lesser, the new travel plan with the agreements is a lesser percentage and it's all in one area, so it would be easier to monitor. So what's wrong with that? Well, what's wrong with that is it ignores reality. As I'm explaining, what is the opportunity for solitude and what is the opportunity for primitive recreation? The way we have it now, as I understand it, there are going to be no snowmobiles in 85% of the area. So in 85% of the area in the wintertime, if you go out there, no snowmobiles. Well, your understanding is based on basically the Forest Service's understanding, which is that's what it says on paper. But the bottom line is there's no enforcement. So if you're going to say snowmobiles can go to this area in the middle of the big snowy wilderness area, but nowhere else, you're assuming that 100% of the public is going to honor that. And you're not providing any enforcement. And that's not realistic. That's a different issue. Okay, there's kind of two issues then. There's this little northwest corner that they talk about. You're saying it wasn't realistic, accessible-wise, for snowmobiles to be in a broad area in 1977. I guess my first question is now, in the current day when this is analyzed, is the remainder of the terrain, by the nature of the terrain, inaccessible by snowmobiles? Or could they access that from the 15%? The record says that snowmobiles today can go anywhere they want in the big snowy wilderness area. They're capable, I'm sorry, of going anywhere. Yes, that's what I meant. Thank you. Yes, and this is the issue. This is why the chief of the Forest Service identified recreational vehicles as one of the four primary threats to the ecosystems in all of our national forests. And this is a wilderness study area. So it seems preposterous to say that recreational vehicles are a primary threat to all of our national forests, but not really to the big snowy wilderness study area as it existed in 1977. It flies in the face of reality, and that's why CMWA has not been satisfied throughout this process. Because they say, well, wait a second, there's no enforcement. More specific, though. So if, in fact, the area that's accessible now is less than 1977, I gather your whole area, there's the area. On paper, it is. In reality, it is not. I understand that. That's what I was trying to get to. Just calm down for a minute. Okay. So what kind, so your objection to the plan then is that it doesn't have an enforcement mechanism to see that what the official rule is is actually applied. So what you would want, how is an EIS going to help that? Well, we want the EIS to take a hard look at the following question. Recognizing that the starting point is the Forest Service has not lived up to its statutory duty to preserve the wilderness character as it existed in 1977, and that's a matter of previous cases. Has not before this travel plan or has not in this travel plan? Has not at any time. It's a continuing breach of statutory duty as found by the courts consistently. But the problem is that under the Supreme Court case in Norton, you can't get at that. You can only get at this plan. Am I wrong about that? We can get at that because we can get at that through the EIS. That's exactly why we need an EIS and not an EA, because the question becomes, okay, what is it going to take to restore the wilderness characteristics as they existed in 1977? And one way to analyze that is a total ban on motorized access versus the managed recreation. So how do you analyze that? How do you take a hard look at that? You have to take a hard look at how would we enforce a total ban and how would we enforce the preferred alternative of managed recreation trails and managed roads, et cetera. And then in order to take that hard look, you'd have to actually say, what kind of budget do we have for enforcement and what kind of personnel can we commit? Do you have, so I'm not bringing to mind environmental cases that took into account this enforcement aspect. Do you have something you could point us to that would be helpful in that regard where you're benchmarking an EIS and it's against availability of enforcement mechanisms as opposed to the baseline requirement? Well, first of all, at this point, we're just asking for them to disclose and study the enforcement issue. Let's get back. I mean, are there cases that support this kind of an argument is what I'm asking, that we ought to be looking at specifically or more carefully because it's a little bit of a more novel argument? I believe so. Okay. I think National Parks and Conservation Association versus BABIT is one of the cases that we cite for the lack of data regarding the practical effect of increased traffic and failure to establish the efficacy of mitigation measures. So in this case, you have basically a failure to observe a statutory duty to maintain the wilderness characteristics because of increasing use by motorized vehicles. So then the question is how do we mitigate that? Obviously, one effective mitigation or realistic mitigation effect would be, well, I don't know, we're going to have to either dedicate some personnel there to enforce things or else just put an outright ban on motorized recreation. And I think that's really what the Forest Service wants to avoid, but that's the only way we're going to get our hands around this is that how do you address this enforcement or the illicit users, let's say, in a way that is consistent with maintaining the wilderness characteristics? I mean, if there were other means, that would be wonderful. They've done that. I mean, they indicate people who have been cited for violations. They indicate most people do obey the rules. What would you have them do differently? Well, first of all, they haven't cited – CMWA has been very consistent through this whole process in saying there is no enforcement against recreational vehicles in the Big Snowy Wilderness Area. The only thing the Forest Service has responded was, well, we have this whole list of enforcement actions in the two ranger districts that the Big Snowy's is within. Those two ranger districts are about two-thirds of the national forest, we're thousands and thousands of miles, and there's not any evidence in the record that shows a single one of those citations – I should take that back, one citation. There's evidence that one citation, which didn't result in a fine, was for a violation in the Big Snowy's, and that was the Humvee that was clearing the road. You've come forward with evidence of how many violations go unpunished? I'm sorry, how many go unpunished? Or undetected? There's no evidence in the record. Right, but they say they enforce it. You know, it's not like an airport where they have security at every ingress and egress, but they say they enforce it, they give citations, and I don't see where you've contradicted that. Well, the record contradicts that because there are consistent conflicts. The record shows a consistent record of conflicts between motorized, illicit motorized users and hikers. But the snowmobiles were allowed anywhere until now, so there was nothing, right? I'm sorry? Were the snowmobiles allowed anywhere? Snowmobiles right now? Well, they were allowed until when? I mean, there was no restriction on snowmobiles until what date? 2002? I'm not sure of that. I'm not sure what the... Because it would matter, and in other words, if snowmobiles were permitted, although you don't think they could get there in early days, and they were going around and interfering with hikers and campers, it wouldn't matter up until the point where they actually restricted snowmobiles. Is that 2002 or what date? I know that the record says that there's no longer any opportunity for primitive recreation experience in the wintertime in the Big Snow Ice Wilderness Study Area. And is that because the other 85% of the land can't be accessed by skis or... No, no. No, that's just the problem. By people who aren't on snowmobile? No, that's the problem, is that snowshoe recreationists, cross-country skiers, are not able to go anywhere now without hearing snowmobiles and not running into snowmobiles running around. That's a separate issue. Hearing versus presence. I mean, you know, they think they're within the 15% amount of land. You might still hear them outside of that. But that's not really your problem. Your problem is that they're going all over the place. Is that right? Right. And the chief recognized this enforceability problem as one of the main reasons this is a primary threat. Because we recognize this as well, that less than 4%, a small percentage of recreational users actually have no regard for those lines on the map. And that's all it takes. It doesn't take 50% of the people ignoring. All it takes is like 3 or 4 people out of 100 saying, I don't care, I'm going to go where I want to. Why is there the same enforcement problem if you ban it all together? If people aren't going to obey the rules, they're not going to obey the rules. It's much more, well, that's why we would like the EIS to look at, you know, how would you enforce, for instance, a total ban? How could you enforce a total ban? This is not an easy area to access. And actually the whole point, one of the primary purposes of the Forest Service and this travel plan is to improve access. We would like them to actually look at making access more difficult. There's only a limited number of access points. Yes, but if people can't get there to hike, the point is to have recreation for people who want solitude. They have to be able to get there. Of course, and, you know, the Forest Service does that all the time by putting up barriers at trailheads that allow horses and hikers to get through without allowing vehicles to get through. Are you still concerned about the summer issues, too, or just about the summer bills at this point? Our primary concern is with the ATVs because they do the most damage. The ATVs in the summertime are the ones. . . The plan now essentially has them on one road for a mile and a half and that's it, right? I'm sorry? Doesn't the plan now allow summer access on one road for a mile and a half and that's it? No. No? No, there's quite a . . . But that's what the travel plan said. You're restricted to this mile and a half open to vehicles. There's no 4x4s, but you can have ATVs for a mile and a half. At this time, there's 71 miles of motorized trails and roads in the summertime in the wilderness study area, and then the final plan approves something less than that. But what about the agreement? Then there was an agreement with the Wilderness Association, and the net result, as I understand it, is a mile and a half. Is that wrong? Oh, are you talking about winter? That's summer now. No, the agreement is just for winter uses. No, there are two agreements, and one of the agreements, as I understand it, cuts back on everything except . . . Oh, I see where your confusion is. You're talking about a settlement of a cross-claim in this case. Yes, that's what I'm talking about. That was just dealing with one. That was just dealing with Maynard Ridge Road or whatever. John, you're wrong. There's more than a total of a mile and a half available now. Yeah, for that road. I thought you said there was a mile and a half total. For that road. That's not my understanding. But you're saying there's 71 miles total in this area that's accessible and permissible for ATVs. Today, and under the Travel Management Plan, it's something less than that. How did that compare to what it was in 1977? No, nothing close to a few miles of open roads. And that's the other reason we would like an EIS prepared, is to look at the conflicting evidence in the record and to weigh the reliability of that evidence. Because you have a congressional finding that there were a few miles of open road Jeep tracks quickly reverting to nature. That's a congressional finding in 1977. And you have a soil scientist, a federal soil scientist, who surveyed the entire area for soils and supported the congressional finding. And they dismissed all that. Do you want to save your minute and a half for rebuttal? I would love to do that. Thank you. Good morning. Good morning. What is the answer to the last question? Let me find out who counsel is first. My name is Alan Brabander, representing the United States Forest Service and the other federal defendants. Before we ask Judge Berzon's question, can you tell me how you folks have divvied up your time? Yes. I will be using 15 minutes if it is necessary, and the two intervener groups will split the remaining five. Got you. All right. What about this question about what is the current travel plan with regard to the summer motorized use access? There is 1.5 miles of road, Swimming Women Road, that is open to wheeled motorized vehicles inside the Wilderness Study Area. Okay. That's it. Now, the Big Snowys also has areas that fall outside the Wilderness Study Area designation, and there are additional roads and trails open in those areas. I don't believe it equates to 71 miles, though. I'm not sure where the 71 miles is. Those are outside of the purview of this lawsuit. Correct. Is that correct? That is absolutely correct. Because they're not in the Wilderness Study box. That is absolutely correct. If this court has any other questions, I'd be happy to entertain them, but otherwise I think we'll rest on our briefs. Well, I do have some questions. Okay. What about this enforcement issue? You say in your surreply, essentially, that NEPA has nothing to do with enforcement. Is that right? Well, you know, even if it is somehow relevant, I don't think there is an enforcement issue here. Motorized travel in the Big Snowys is not that common. Illegal motorized travel is even less common. And now there are certainly instances where somebody gets away with violating the travel plan as people violate all sorts of laws. But when these instances happen, the Forest Service notes them, attempts to assess whether there is a problem, and then attempts to rectify that problem. If this court would look at the monitoring reports in the record at pages 187 to 217 of the supplemental excerpts, it shows this. And, in fact, this is one purpose of this plan is to promote compliance with the travel regulations and to help the Forest Service's enforcement efforts. How does the plan do that? For the most part, people do not set out to violate the travel plan. They do so for two primary reasons. One, they don't know they're violating the plan because the trails are not well marked. Or, two, they're on a trail that is open, and they go a long ways on this trail, often through difficult terrain. And then they get to a point of the trail or road that is closed. And so they're then faced with the choice of going back where they came from or taking the shortcut across a closed road or trail. And too many times, they go across the closed trail. Now, this plan will eliminate any confusion that these motorized recreationists might have by closing every single trail to motorized wheeled travel, closing 34 miles of road, I believe, leaving only 1.5 miles open to motorized wheeled vehicles inside the wilderness study area, and confining snowmobile use to one corner, the northwest corner, that has some geographic boundaries that are easy to understand. So this plan will promote compliance. And another aspect of this plan is to provide better trail markings and fencing so that, again, the confusion is eliminated. Was there also some provision in the agreement about the snowmobiling area for monitoring at certain points or something like that? That's right. I think within the winter recreation agreement, the Forest Service does state that it will enforce the motorized recreation agreement and that the Wilderness Association and the Snowmobile Association will support the Forest Service's efforts in that regard. Okay. Okay. Thank you. For Montana Wilderness, or are you with the Snowmobile Association? My name is Paul Turk. I represent the Snowmobile Association. It's been a few years since we've had one of these recreation cases in front of the circuit, but it reminds me of maybe the last time I was involved in one, and I think Judge McEwen authored the opinion and started off with the maxim that you can please some of the people all the time and all the people some of the time, but you can't please all the people all the time. And that's a little bit what we've got going on here. Incidentally, that was the Hell's Canyon Alliance case, which was about jet boating on a wild and scenic river. It's somewhat monumental that we've got the Wilderness Association and the Snowmobile Association sitting at the same table here. And I can't take a lot of credit for that, but somewhere along the line, these clients and these organizations collectively determined that they'd be better off kind of taking some control over what happened on the ground and stopping what seemed like an endless stream of cases through the judicial branch and checks to lawyers and time spent doing things other than being out in this country. This is immense country. As I think it was Judge Berzon noted, 85% of it is virtually closed to any kind of mechanized travel. If you want to get away from the sounds, smells of mechanized equipment or other people, there are ample places in this 90-some-thousand-acre chunk of public land in which to do that. I've got to reiterate the district court's characterization that appellant's arguments here are long on argument and short on support. Theoretically, by the time we're in front of this panel, we're at least two layers divorced from kind of the fact-finding process here. There's an administrative process in which these issues are analyzed. There's what's basically quasi-appellate review in the district court on the administrative record. And at this level, we're yet another layer separated from that in looking at things that were documented on the district court record. I direct the panel's attention to our supplemental excerpts 11. This is the map that showed where Stumblebills went in 1977. And the fact is they went a lot of places. In my experience, every party kind of has their own spin on what happened in these areas. And when you're talking about something that occurred 20 or 30 years ago, as you can imagine, the spread of evidence gets even broader. The fundamental point here, which I think Judge Malloy aptly analyzed in the district court decision, is that the Forest Service looked at all this. They adopted a final decision that dramatically reduces motorized access beyond what it was in 1977, and that they carefully considered all the relevant opinions, including the somewhat unusual agreement between the Wilderness Association and the Stumblebill Association. There are two sort of procedurally odd things here, though. One of them is that the EAA actually was not responsive to the current program because it's been changed. In other words, because of the two agreements, what was being analyzed in the EAA is not the program that's on the ground now. I suppose your response will be, well, but it's better from an environmental point of view. But weirdly, as I understand the statute, they're supposed to be in the EIS even for beneficial programs or impacts. That argument has been made here, as I understand it, but technically speaking, would that be right? You gave me two good answers there. You took two of my best answers, and so I'm going to stick with those. I was trying to get to what was really bothering me. Fundamentally, the best answer is that the argument wasn't raised here, and so I don't necessarily want to engage the panel in an argument that appellants haven't raised. But that being said, yes, it's a legitimate observation, and I don't know if we're going to see further analysis of that or not. My experience has been that these projects never go away. They continue being analyzed, and this forest is going to get back to analysis of this area and others. And one other question is, I'm not really sure that I understand what the impact of the agreements is. Has the plan been modified, or will the plan be modified, or exactly what are we looking at? I'm glad you asked that question, because in candor, I've been under a little bit of fire with some other groups that I represent in discussing these agreements, because at one level, it kind of has this feeling like some interest groups got together, and they came up with a plan and handed it to the Forest Service, and that's not the way it works. Number one, the Forest Service was a party to the discussions. They were open discussions, and the result of the agreement is but one alternative. It's basically a suggestion of the signatories to the agreement as to what an appropriate alternative within the range of, quote, viable options would be that the agency should consider. So why are we looking at the agreements, then, as opposed to the original travel plan? Well, I think, I mean, the agreements are better. I know they're better, but they're not on the ground implemented at this point. Well, the winter use agreement, Mr. Brabender maybe can answer that better than me, but my understanding is that they are being implemented. Well, if they're not part of some final order or plan, then they wouldn't be something we would even be looking at on appeal. So if there's any ambiguity about that, we may not have jurisdiction. The winter agreement is, it's my understanding the winter agreement is being implemented pursuant to a forest order, and, again, I don't, you know, whether or not that's been. . . Yeah, I thought it was part of an EA and that there was, you know, a finding of no significant impact, and that was how we got here, but maybe we better have the government tell us that answer to that. Well, I'll let Mr. Brabender. Wasn't there a summary judgment motion? Yes. And this is the culmination of those proceedings, wasn't it? Correct. I do. . . Why don't you, if you would. . . Let me wrap up. We'll let the Wilderness Association have a word. Let me wrap up real quick, but in leaving, I want to stress, too, and we've litigated a number of these cases under the Wilderness Study Act. These are not wilderness areas. It's not wilderness. It's a wilderness study area. There's not any conflict between having motorized use in a wilderness study area. The goal of the statute, and it's a rare environmental statute that has a substantive component as well, which is to maintain the wilderness character that existed at the time of passage, which was in 1977. Ultimately, the Forest Service did do a study of this area and found that it didn't qualify for wilderness designation, at least in the Forest Service's determination. Thank you. May it please the Court, I guess I'm back up here to answer a couple of Judge Berzon's questions. First, the CEQ regulation that you were referring to regarding the beneficial impacts, I don't think it says that an EIS has to be prepared if there are significant beneficial impacts. What it says is even if a project or decision might have a net benefit, there still may be significant negative impacts that need to be analyzed. And so a project with only beneficial impacts does not need to be analyzed. And two, the Winter Recreation Agreement, if this Court will recall, provides for more snowmobile access. The Forest Service initially proposed, I think, 12% under its original decision. And second, even if this plan has not been implemented, there is only four more miles, I think, of Maynard Ridge Trail that would be used by motorized wheeled vehicles, which would still be consistent with the 1977 Montana Wilderness Study Act. But in fact, the agreements are not officially in the plan now, is that right? You know, I don't think there has been an official order, although they are being implemented. Well, you know, what's the appeal to – I mean, the question I have then is what's the administrative status on the appeal to the district court if they haven't been implemented and we're arguing about them? That's a good question, Your Honor. I would have to give that some more thought if this Court would like a – We'd like to. Okay. Thank you. What was the summary judgment, did he not? Yeah, but that didn't mean that. Well, I'm asking you, what did the summary judgment order do? The summary judgment order considered both the Winter Recreation Agreement and the Maynard Ridge. And you're saying, in answer to the questions, they were never, what, filed with the – No, the Forest Service has never, at least as far as I know, I can check on this, and I will check on this. As far as I know, the Forest Service has never issued a formal order changing its plan in regard to these amendments, although it is implementing these amendments in the forest. We have jurisdiction under the APA over final orders or final determinations, and it doesn't sound like it is one. Right, and that's the tricky question, which I would like more time to consider. I frankly haven't considered it. Well, is there one at all? I mean, if you're – you have a travel plan, but you're saying that's really not the travel plan we're going to do. We're going to do a different travel plan, but we haven't done the different travel plan. Well, there was certainly a final order at the time that this appeal was brought, yes. Right. And is that the travel plan, but not the settlement? That is the travel plan without, I believe – Alternative one. Without the – that is alternative one. But what kind of sense does it make for us to be looking at that when we know that's not what you're going to do? It's a very peculiar situation. It is a very peculiar situation, and frankly, I don't know how to answer your question. Well, I mean, let's say – let's just say that you have the travel plan alternative one and we say hypothetically, oh, well, that seems to meet, you know, NEPA and the forest plan. Then that's kind of, like, irrelevant, basically, because that's not even a plan that's on the ground. Well, there was a final order, and I think, you know – But I was saying, if there's a final order and we issue some order on that, it seems like it's been overtaken by NEPA. This case may be moot, if that's what you're driving at. Particularly with regard to the snowmobile group agreement, which, as you point out, provides for more snowmobile use. It wouldn't make a whole lot of sense for us to review the plan that provides for less snowmobile use and say, oh, that's an okay plan, when that's not the plan you're already determined that you're going to have. Well, I think either way you look at it, what the Forest Service is doing complies with the Montana Wilderness Study Act. Did this case ever go through the Ninth Circuit mediation process? No, I do not believe so. Okay. What could it mediate? I don't quite – what would be open to mediate if there's – I don't think there would have been any – I don't think it would have resulted in a successful mediation. Are the import of the questions that the agency has to make a new record decision, is that the – when you say it's moot, I didn't quite get what you meant by that. Well, the final – I mean, if the final order is not being implemented – By implemented, you mean what? Well, it's no longer the – the plan as approved is no longer the plan – That the Forest Service intends to. That the Forest Service intends to. Or is adopting right now. Correct. As far as I know. Now, this could all change if the Forest Service has – Well, no. You've caught me off guard. I just don't know how to answer your questions. I'm sorry. But it is at least true that these agreements, as you said, are essentially suggestions to the Forest Service, which hasn't yet adopted them in a formal manner. As far as I know. Hmm. Okay. Anything from the Wilderness Association? I wanted to hear from her for a second, if we may. I just want to make one clarification to hopefully save us some time, because this thing's been going on for years. But the Winter Use Agreement has been implemented. It is what governs on the ground. It's been implemented through a forest order. Is that the order that was appealed from, though? No. No. It's not the EA. It's not the outcome of the EA. But that's – You know, you can't just sort of come up here and – You know, we spend all this time looking at all this stuff, and then it's like, well – But it's – You know, we can't rule on a situation that's not a final order that came through the district court and the EPA. And I appreciate that. There's an argument as to whether it's final agency action, whether it's the consummation of the process, and whether it has concrete effects on travel. But whatever it is, it isn't what the case was brought on. Right. That's not what the plaintiff argued here. And so we – I think we have to address the issue as the plaintiff framed it. Meaning the travel plan that doesn't – that's no longer operative. The travel plan, alternative one, and that's what we make a decision on. And then – but that's not what your clients have a dog in the fight about. The plaintiff's arguments – we certainly oppose the plaintiff's arguments against the winter plan. But the winter plan now has more access than it did before. So for us – It's changed, yeah. It's changed, yeah. All right. So for us to be reviewing – And you're telling us that the new one's been implemented by a Forest Service order and that the old one essentially is never going to be implemented. So why are we reviewing it? It's a legitimate question. It's not one that the plaintiff presented. I do want to – I've been trying to call on Ms. McGill for the last five minutes. So let me let her get her word in here. Good morning. Thank you. Good morning. May it please the court. My name is Sarah McMillan. I'm here on behalf of the Montana Wilderness Association in an uneasy alliance with the Snowmobile Association and the Forest Service. And it has, I have to admit, just become more uneasy because if we are now talking about the travel plan without these two agreements, I am unclear – What are – can you enlighten us as to what we should be talking about? I have to say that this is an issue that I don't – the person I was working with, Tahulski, didn't think of. Judge Malloy didn't raise. It's not an issue that we even talked about. And so it's – Well, do you think maybe we should remand him and let you all talk about it to figure out whether there's jurisdiction over whatever it is we're trying to decide? Your Honor, I am truly confused right now because – Well, let me ask you this. Judge Malloy, he obviously ruled on something, okay? And he ruled on what seemed to be talked about as the travel plan, and then he indicates that your client and Mr. Turk's clients joined in because of the winter portion of the travel plan. So in your view, was the travel plan he was talking about what I'll call the revised travel plan with the agreements kind of folded in? Judge Malloy was including the winter use agreement that had been reached by these different and diverse groups during the administrative appeal process. That's what he was talking about in his order. And so it is an agreement that came out during the administrative appeal. But I have to say that a portion of that – the winter use agreement says the clients will support an alternative that will include these provisions. So if – that would raise a whole new question, and I don't – you know, that if that's the case, maybe Mr. Woodbury, you know, if you change it from 11% to 21%, for example, then maybe that's sufficient to have a new alternative which would call for some kind of a new EIS. Well, I would say first some other kind of comment. Well, I would say to start with, the facts regarding what winter use there was in 1977 are very sparse. The affidavit from Mr. Clark, who was in the area at that time, notes specifically that he was there during non-snowpack time, so he's not aware of what snowmobile use existed there. And that's the issue, not whether the entire area was accessible or not, but what use existed. And since there wasn't that information, the Forest Service went ahead and tried to determine what would have been accessible. And then in both their EA and then in the winter use agreement, reduced from that amount. And not only did they reduce, they then segregated. Rather than the initial EA, or decision travel plan, had winter use in three separate areas, and it may have been a smaller amount total, but it was in three dispersed areas. And then the winter use agreement segregated, combined the areas, segregated them off to a corner, leaving 85%. Can you walk me through a procedure? I want to make sure I get this understood. We get the ball rolling when Central Montana Wildlands files a lawsuit saying that the government is not in compliance with the Wilderness Study Act. They say in count two they're also violating NEPA. Yes. So that's the issue that's framed by the complaint. It goes up on appeal on issues that I'm not sure are pertinent at the moment, but then it comes back and it falls in Judge Malloy's lap to decide whether the government has violated the Wilderness Study Act and violated NEPA. This is the first time this case has come up on appeal. Well, there was a Montana Wilderness Study Act case that ended up being decided by Norton v. SUA. That's a separate case, but that was the first time that a court said, yes, in fact, there is an ongoing duty. You're right. The issue, though, before Judge Malloy is whether the Montana Study Act was violated and whether NEPA was violated in relation to the record of decision made in 2002. Yes, Your Honor. Okay. Somewhere along the line you intervene and the Snowmobile people intervene. And that was pursuant to a provision of the winter use agreement that said these parties will intervene in order to defend. So the agreement was before or after the suit was filed? Before. The winter use. Now, the summer agreement, you were a cross-claimant with regard to the summer agreement. Yes, that's right. And then you entered into an agreement with the Forest Service before or after the summary judgment. Unfortunately, very shortly before. Before. It was a bit of a surprise, Mr. Woodbury. Okay. So before. Yes. So therefore, and then Judge Malloy in deciding what he was deciding was taking both of them into account, right? Yes, Your Honor. Yes. So he was assuming that he was acting not on the travel plan as it was originally entered into, but as these agreements suggested it might sometime in the future be entered into, essentially. Yes, Your Honor. They are being implemented. Why isn't Judge Malloy within his rights to say they claim the Wilderness Act was violated? On summary judgment, I rule that it was not violated. Well, I would say initially on this is the first time that the Forest Service has ever actually, in its supplemental EA, considered wilderness characteristics, recognized that motorized use causes damage to those wilderness characteristics. You say why he's right. I'm asking you why isn't he within his jurisdiction to say, look, they claim he violated the Wilderness Act. I've looked at the evidence, and they have not violated the Wilderness Act. Final judgment as to that. Why isn't that, in terms of figuring out whether this is moot or not, why isn't that just the question in our lap at the moment? Your Honor, I'm afraid you're asking me to make Mr. Woodbury's argument for him, I think, because I think the question is Under Norton, you can't just act on the overall situation. You have to act on a final, discreet decision. And the final, discreet decision here was the travel plan, not the agreements that were potentially in the future going to modify the travel plan. And it says this, Forest Service was supposed to prepare an amendment to the travel plan. Now, that's what we're unclear. We have the agreements. We don't know if there was an amendment which would be the final agency action that would incorporate the agreements, correct? And that amendment would not be part of what Mr. Woodbury challenged. And I think that's what has us all flummoxed at this table, is this is somehow, through this entire process, it has been our understanding that it is the travel plan with those two agreements that we have been discussing. Correct, because that's what Judge Malloy said. I mean, you don't – the complaint was filed, and then it was after that the summer agreement was issued. And then after that, the district court grants summary judgment. So it's kind of a moving target here as to the status of the travel plan. So when it's first appealed from, the winter agreement had been entered into, but there may not have been an amendment of the travel plan. I guess we just don't know the answer to that. We don't know the answer to that. Okay. Yeah. I'm sorry I can't answer your questions. Thank you very much. It's confusing. Mr. Woodbury, you want to take a minute or so to wrap up? Thank you. Our arguments, if you look at our appellate brief, are based on the EA. And at district court level, we objected to this agreement, and we did get into that a little bit before Judge Malloy, but our primary objection was concerning the wildlife impacts to the lynx because the playground that they established is right in the middle of a denning habitat for the lynx. But the EA relates to a plan, and the plan is the travel plan. Yes. Which we now know, for two different reasons, is not what the Forest Service intends to do, maybe. So what do we do? Yeah. And also, the Forest Service consulted with Fish and Wildlife on the impacts to lynx based on the travel plan, but not on the basis of this side agreement. So, again, that's what our objection is. The original alternative one, the consultation with FWS, was based on the original, not on the, we'll call it the amendment. Right. And, again, I mean, if you read our arguments, they're based on the SEA, not on this agreement. What is your understanding at this point about whether we have jurisdiction, and if so, over what? Over the final decision on the travel management plan. Just the travel plan without the agreement? That's our position, yes. And that was your complaint? Yes. So you didn't include these amendments? We objected to that, but we didn't challenge it. Now, let me ask you this, and, of course, we don't know exactly, we might have to ask him, but is it your understanding, however, that when Judge Malloy ruled, he was ruling on the travel plan as it might be amended or incorporated by their agreements? Yes. And that was not what you actually filed your suit on? No. Can I make one final correction on the roads, the issue of motorized travel? The final plan, as our brief makes clear, approved 16.8 miles of road in the Big Snowies for motorized uses and 20.9 miles. Wait a minute, in the WSA or just in the Big Snowies? In the WSA and 20.9 miles of motorized trails. And part of the confusion is based on there's about four different explanations from the Forest Service about what the boundaries of the WSA are. And it has changed over time from 1977. At one point they recognized that it was about 100,000 acres. Congress, it was about 92,000. This travel management plan says like 86,000 or something. And that's critical because a lot of those roads are access roads on the boundaries. And so without clarity on that, and, again, another reason to take a hard look and explain all these discrepancies, without clarification on what the boundaries of the WSA are, what they include and what they don't, it's impossible. It's a moving target for the public to respond to this, especially when they're doing all their analysis based on how many roads and trails existed in 1977 versus today. And they don't even tell us, they can't even give us consistent answers on what the boundaries are. Okay, thanks very much, Mr. Bergeron. Thank you, counsel. The case is submitted.
judges: Silverman, McKeown, Berzon